**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COLE UNGER, on behalf of himself and all others similarly situated, <br><br> *Plaintiff*, <br><br> v. <br><br> THE WALT DISNEY COMPANY, a Delaware corporation, <br><br> *Defendant.* | Case No. <br><br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Cole Unger ("Plaintiff"), on behalf of himself and all others similarly situated, upon personal knowledge as to the facts pertaining to himself and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action complaint against the above-captioned Defendant, The Walt Disney Company ("Disney") (the "Defendant") for violations of the state and federal antitrust laws, seeking actual damages, treble damages, disgorgement of profits, injunctive relief, a declaratory judgment, reasonable costs and attorneys' fees, and pre- and post-judgment interest.

## I.    NATURE OF THE ACTION

1.     This action arises from Defendant Disney's multifaceted campaign to suppress competition in the market for live television streamed over the internet to paying subscribers ("streaming live pay television" or "SLPTV").

2.     Disney's ownership of ESPN, which dominates the market for broadcasts licenses from the major professional sports associations, enables it to extract monopoly rents in the SLPTV market via anticompetitive tactics including: (i) forcing streaming services to carry Disney's non-ESPN content in order to access ESPN; (ii) forcing streaming services to include

ESPN, country's most expensive content channel, as part of their "base"—or cheapest—package for consumers; (iii) inflating prices by means of Most Favored Nation's clauses (MFNs), and (iv) providing anticompetitive rebates to affiliated streaming services including Disney owned-Hulu.

3.      These anticompetitive tactics restrain competition from rivals to Disney's Hulu in the SLPTV market and force independent streaming services such as Fubo to charge higher prices to their customers than they would in a free market.

4.      Plaintiff, like nearly 2 million American consumers, subscribed to fuboTV ("Fubo"), one of the largest SLPTV providers. Plaintiff brings this suit under the Sherman Antitrust Act, as well as under various state antitrust and consumer protections laws, to, among other things, recover economic damages as a result of the supracompetitive prices paid as a result of Disney's anticompetitive conduct.

5.      Disney's anticompetitive conduct includes using its dominant share of broadcast licenses for commercially critical sports content to force Fubo to license and broadcast unwanted, expensive, non-sports content. This prevents Fubo from offering the sports-centric package of channels that its customers want. Disney also imposes artificial, above-market prices and other onerous economic terms on Fubo through a web of most-favored-nation ("MFN") clauses in Disney's contracts with SLPTV providers.

6.      Notably, Disney owns ESPN (the Entertainment and Sports Programming Network), which has a chokehold over sports programming in the United States. Unless otherwise specified, throughout this Complaint, "Disney" will refer to Defendant, The Walt Disney Company, and its subsidiaries and affiliates, including ESPN.

7.      Fubo licenses sports content from Disney through carriage agreements between Fubo and Disney and its affiliates. The carriage agreements allow Fubo to stream Disney's

valuable sports programming to Fubo's customers. The carriage agreements also require Fubo to spend millions of dollars per year on non-sports content it does not want and does not fit within its core business strategy.

8.     Additionally, Disney owns, operates and controls the second largest SLPTV provider, Hulu, which provides a SLPTV product called Hulu + Live TV.

9.     Disney's carriage agreements with its SLPTV competitors contain two terms that provide Disney pricing power (and therefore monopoly power) over the entire live television streaming market (the "Relevant Market"). *First*, Disney's carriage agreements contain language requiring that base or lowest-price bundles offered by SLPTV providers must include ESPN and ESPN-related channels (the "Base Term"). *Second*, Disney's carriage agreements include Most Favored Nation ("MFN") clauses that put upward price pressure on every rival SLPTV product other than Hulu.

10.     Together, these carriage agreements—which now cover all of Disney's leading competitors in the SLPTV market—allow Disney to use ESPN and Hulu to set a price floor in the SLPTV market and to inflate prices market-wide by raising the prices of its own products. And this is exactly what Disney has done since it took operational control of Hulu in May of 2019. Disney uses its control over the Relevant Market to drive costs up for competitors like Fubo.

11.     Launched in January of 2015, Fubo, a New York-based sports streaming service, sought to provide sports programming directly to consumers who wish to avoid paying for expensive cable bundles that included live sports. Seeking initially to become the "Netflix of Soccer," Fubo's initial investments included streaming contracts with soccer-focused channels before growing in 2016 to include sports content from Univision, NBC, Fox, and NBA TV. Fubo

grew rapidly and was named by Forbes Magazine in 2019 as one of its "Next Billion-Dollar Startups." On August 1, 2020, Fubo added ESPN's programming to its package, leading to a surge in subscribers from about 100,000 in 2016 to nearly 1.5 million subscribers by the third quarter of 2023. Fueled by innovation, creativity, and growth, Fubo began trading its shares on the New York Stock Exchange in October of 2020.

12.    To carry Disney's sports content on a live streaming platform, as Fubo has done since August of 2020, Fubo is required to pay Disney's unlawful monopoly rent. Disney's dominant share of broadcast licenses for live sports makes its content a necessity to compete in the Relevant Market. Without it, SLPTV services like Fubo lose access to critical sports programming that commands millions of viewers across the United States.

13.    In contravention to its original business model as a 'disruptor,' Fubo readily admits that it had to nearly double the prices it charges to consumers as a result of Defendant's anticompetitive conduct.

14.    These higher prices, which consumers (such as Fubo consumers) pay for streaming platforms, harm both consumers and competition alike. As a senior Disney executive explained point-blank to Fubo's CEO, Disney did not want Fubo to become "the next Netflix." And so, to prevent that from happening, Disney has engaged in a course of conduct to drive Fubo into the ground.

15.    In a related case previously before this Court, Fubo challenged a proposed joint venture among Disney and two of its horizontal competitors in the sports programming market—Warner Brothers and Fox—which would have constituted a live streaming service very similar to

Fubo's.[1] The Court granted Fubo's motion for a preliminary injunction to stop the venture. As the Court stated in its order enjoining the venture:

> But even if [Disney and the other Defendants] swear that such price-hiking and competition will not actually occur … one purpose of antirust injunctions is to prevent anticompetitive incentives from forming in the first place so that American consumers do not have to simply take their word for it and hope for the best.[2]

16.     Additionally, during a December 2024 hearing, the Court denied defendants' motion to dismiss, finding that Fubo plausibly alleged that the defendants, including Disney, used their market power to force customers to buy unwanted television channels and that Disney's MFN clauses prevented Fubo from engaging in fair competition on price.[3]

17.     On January 6, 2025, the parties settled and voluntarily dismissed their action with prejudice.[4] Under the settlement, the defendants agreed to pay Fubo $220 million in cash, and Disney specifically committed to pay Fubo an additional $145 million term loan in 2026. On that same day, Disney announced it would merge its SLPTV product, Hulu + Live TV, with Fubu. The combination will create the second-biggest SLPTV product in North America.

18.     The terms of the settlement were immediately criticized by industry participants. For instance, on January 7, 2025, EchoStar Corporation, the parent company of SLPTV competitor SLING TV, filed a letter on the Court's docket condemning the deal. Specifically,

---

[1] *See* Amended Complaint, *fuboTV Inc., et al. v. The Walt Disney Company, et al.,* Case No. 24-cv-01363-MMG (S.D.N.Y. Apr. 29, 2024), ECF No. 144.

[2] *fuboTV Inc. v. Walt Disney Co.*, No. 24-CV-01363, 2024 WL 3842116, at *2 (S.D.N.Y. Aug. 16, 2024).

[3] *See* Khushita Vasant, *FuboTV defeats Fox, Disney, Warner moves to dismiss US antitrust complaint, switch venue*, MLex (Dec. 14, 2024), https://content.mlex.com/#/content/1617696/fubotv-defeats-fox-disney-warner-moves-to-dismiss-us-antitrust-complaint-switch-venue.

[4] *fuboTV Inc., et al. v. The Walt Disney Company, et al.,* Case No. 24-cv-01363-MMG (S.D.N.Y. 2024), ECF No. 375.

EchoStar said that the defendants, including Disney, have "have purchased their way out of their antitrust violation . . . [t]hrough the settlement and acquisition."[5]

19.    Similarly, the American Economic Liberties Project issued a press release highlighting the anticompetitive nature of the deal:

> Disney's acquisition of Fubo . . . represents a troubling escalation. By absorbing a direct competitor and critic, Disney is reinforcing its dominance in the sports streaming market and silencing opposition to its monopolistic practices. This move will leave consumers with fewer choices, higher prices, and less innovation in an already concentrated industry. With its ownership of ESPN, Disney is already the most powerful player in sports media. Adding Fubo's platform further entrenches its monopoly power, enabling it to limit consumer choice, drive up costs, and stifle competition.[6]

20.    On January 10, 2025, Disney, Warner Brothers, and Fox announced that they had called off their planned joint venture.

21.    As the court in the *Fubo* action found, and as described in greater detail below, Disney has used and will continue to use its monopoly power in the market for live sports broadcast licensing to extract supracompetitive pricing from consumers, like Plaintiff and members of the Classes (defined below).

22.    As such, Plaintiff and members of the Classes bring this class action against Disney for violations of Section 1 of the Sherman Antitrust Act and various state antitrust laws, as well as for unjust enrichment, and seek, among other things, actual damages, treble damages,

---

[5] *fuboTV Inc., et al. v. The Walt Disney Company, et al.,* Case No. 24-cv-01363-MMG (S.D.N.Y. 2024), ECF No. 377.

[6] American Economic Liberties Project, "Disney's Acquisition of Fubo Undermines Competition and Harms Consumers, Federal and State Enforcers Must Act" (Jan. 6, 2025), *available at* https://www.economicliberties.us/press-release/disneys-acquisition-of-fubo-undermines-competition-and-harms-consumers-federal-and-state-enforcers-must-act/.

disgorgement of profits, injunctive relief, a declaratory judgment, reasonable costs and attorneys' fees, as well as pre- and post-judgment interest.

## II.    JURISDICTION AND VENUE

23.    **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members in the proposed Classes; and at least one member of each of the proposed Classes is a citizen of a state different from Defendant.

24.    This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

25.    **Supplemental Jurisdiction**. In addition to violations of the federal antitrust laws, Plaintiff also alleges violations of state antitrust and state consumer protection law, as well as unjust enrichment. All claims under federal and state law are based upon a common nucleus of operative fact and the entire action, therefore, should be commenced in a single case to be tried as one judicial proceeding. This Court, therefore, has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a). Exercising jurisdiction over the state law claims will avoid unnecessary duplication of actions and support the interests of judicial economy, convenience to the litigants, and fairness.

26.    **Personal Jurisdiction**. This Court has personal jurisdiction over Defendant because it transacts business or may otherwise be found in this District. Specifically, Disney has multiple corporate offices and operations in this District, including its New York, New York headquarters and production studios for ESPN. Disney is registered to do business in New York as a foreign corporation and has an appointed agent for service of process in New York. ESPN

has corporate offices, is registered to do business in New York as a foreign corporation and has an appointed agent for service of process in New York. Hulu maintains offices in this District. Hulu is also registered to do business in New York and has an appointed agent for service of process in New York. Disney and its affiliates maintain continuous operations in this District. This Court also has personal jurisdiction over Defendant because its conduct, as alleged herein, caused harm to consumers and others (such as Fubo) in this District.

27.    **Venue.** Venue in this District is proper as Defendant transacts business or has registered agents in this District. Venue is also proper in this District because Defendant's conduct, as alleged herein, caused harm to consumers in this District.

28.    **Interstate Commerce**. Defendant's conduct as alleged herein substantially affects interstate trade and commerce by harming competition, raising prices, restricting output, and harming consumers throughout the United States.

### III.    PARTIES

29.    Plaintiff Cole Unger is a resident of Baltimore, Maryland. During the Class Period (defined below), Plaintiff had an active Fubo account in order to consume sports and other programming within the Relevant Market. As a result of Defendant's anticompetitive practices, Plaintiff paid higher prices for Fubo.

30.    Defendant The Walt Disney Company is a public company incorporated in Delaware with its principal place of business in Burbank, California.

31.    Disney operates multiple lines of business, including the following relevant lines, which are operated through one or more subsidiaries:

    a.    *ESPN*. ESPN is a set of sports-branded television channels, including nine 24-hour domestic television sports channels, as well as radio stations. Disney

controls ESPN with an 80% share. The remaining 20% share is owned by Hearst Communications.

b. *ABC Television Network*. ABC Television Network is a major national television network with approximately 240 local television stations, reaching almost 100% of all U.S. television households. ABC broadcasts programs throughout the day, including news and sports. ABC cross-brands certain products with ESPN.

c. *Hulu*. Hulu is a subscription-based video streaming service. Hulu offers two primary products, a streaming video on demand service ("SVOD") and a live streaming television service, Hulu + Live TV, which Disney refers to in its 2021 annual report as a digital "over the top" MVPD service. While it was originally jointly owned by several industry players, as of 2023, Disney owns 100% of Hulu. Disney has maintained full control of Hulu since at least May 2019.

32. Disney operates Hulu with unfettered control and unity of interest and purpose, such that Disney and Hulu operate as a single economic unit. Indeed, Disney reports Hulu's profits and losses as part of its consolidated balance sheet.

33. Disney operates ESPN directly, exercising complete operational and financial control over ESPN's lines of business. Disney reports profits and losses for its ESPN lines of business and properties as part of its consolidated balance sheet. It operates with unity of interest and purpose with ESPN. Indeed, Disney negotiates carriage agreements on behalf of ESPN, and Disney makes statements to the press and the public about those carriage agreements on behalf of ESPN. ESPN is operated by Disney executives and personnel.

34.     ESPN, Hulu and Disney operate as a single economic unit, with a unity of purpose. Their profits and losses are shared and reported as part of Disney's balance sheet. Disney operates operational control over the entire economic entity, and Disney negotiates contracts on behalf of the combined operations.

35.     Various other persons, firms, and corporations not named as a Defendant have participated as co-conspirators with Defendant and have performed acts in furtherance of the illegal conduct described herein. These unnamed co-conspirators include, but are not limited to, Fubo, DirecTV, and Google-owned YouTube. Defendant is jointly and severally liable for the acts of these unnamed co-conspirators.

36.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

37.     Defendant is also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

## IV.   FACTUAL ALLEGATIONS

### A.     The Relevant Market and Market Power

38.     The relevant product market affected by Disney's anticompetitive conduct is the market for streaming live pay television or (SLPTV), which is a distinct submarket of the live television market that includes cable and satellite television providers. The relevant market includes subscription-based services that provide streaming access to live television channels over an internet connection. The relevant geographic market in the United States.

39.     Providers of streaming services in the Relevant Market generally create a base or basic package of channels, which is the minimum number of channels a subscriber must

purchase in order to gain access to a subscription. Providers generally do not allow subscribers to choose individual channels to include in subscriptions.

40.     The streaming products in the Relevant Market (*e.g.*, Fubo, YouTube TV, Hulu + Live TV, DirecTV, and others) appeal to subscribers because they not only provide live television services without the need to subscribe to a cable or satellite television plan, but because these products are available on multiple types of devices (*i.e.*, smartphones, televisions, tablets, laptops, etc.). Many streaming services in the Relevant Market also offer access to programming without the long-term contracts associated with cable and satellite television subscriptions. Many consumers purchase streaming products in the Relevant Market because these products provide access to live sports.

41.     Broadcast licenses for professional sports are expensive to obtain, and as a result, ESPN and other live sports channels are typically the most expensive for both providers of cable and satellite television subscriptions as well as providers within the Relevant Market. Channels like ESPN are generally the most expensive components of any given cable or streaming package.

42.     There are three major levels of players above consumers that participate in the multi-billion-dollar sports programming market: sports leagues, programmers, and video distributors. Sports leagues offer the licenses to broadcast content, both in a live format and as replays as part of sports programming shows. Programmers are downstream users of the licenses, repackaging the broadcast content in a way that is consumable by consumers of sports on televisions through cable packages and on streaming platforms. Finally, video distributors are the last level of distribution prior to the actual consumer; video distributors, like Hulu, YouTube TV, DirecTV and Fubo, provide content directly to consumers. A depiction of this can be seen below:

**Figure 1**



43.    In order to obtain the best possible price for sports programming, and to avoid having to buy bloated cable bundles that include content that a sports-watcher would not want, many consumers opt to subscribe to streaming services like YouTubeTV, Hulu+Live TV, DirecTV, and Fubo.

44.    Disney is the dominant licensor in the upstream market for sports broadcast media rights. ESPN has licenses with all the major professional sports associations including, among others, Major League Baseball ("MLB"), the National Basketball Association ("NBA"), the National Football League ("NFL"), the National Collegiate Athletics Association ("NCAA"), and the Ultimate Fighting Championships ("UFC").

45.    To put an even finer point on it, ESPN has rights to *every major sport:*

      a.    **Professional Football**: ESPN owns rights to the NFL's Monday Night Football, Wild Card Playoff game, Divisional Playoff Game, Pro Bowl,

and the Super Bowl (self-produced every four years), as well as the NFL
Draft.

b. **College Football**: In college football, ESPN owns the rights to Saturday
Night Football, the College Football Playoffs (including the National
Championship), the SEC Championship Game, the Big 12 Championship
Game, the Athletic Coast Conference ("ACC") Championship Game, the
American Athletic Conference Championship Game, regular season
Southeastern Conference, Big 12, and ACC games, as well as major bowl
games and highly sought-after rivalry games such as Alabama-Auburn,
Georgia-Florida, the Peach Bowl, the Rose Bowl, the Sugar Bowl, the
Citrus Bowl, the Celebration Bowl, the LA Bowl, and the Music City
Bowl. ESPN also owns rights from a variety of mid-major and smaller
conferences.

c. **Baseball**: ESPN owns the rights to significant regular season MLB games,
including exclusive rights to Sunday Night Baseball, and exclusive rights
to MLB Opening Night, MLB World Tour, and MLB Mexico Series
games. It also owns the exclusive rights to seven MLB playoff series per
year and to Little League World Series games.

d. **Hockey**: ESPN covers NHL All-Star Week, including the NHL Draft and
All-Star Game, as well as the NHL Stadium Series, ABC Hockey
Saturday, and the Stanley Cup Playoffs. ESPN also has exclusive rights to
the Stanley Cup Finals (in even-numbered years), as well as over 100

exclusive regular season games, and over 1,000 regular season games available exclusively on ESPN+ via NHL Power Play.

e.  **College Basketball**: ESPN is the largest broadcaster of men's and women's college basketball, including major conferences such as the Big 12, SEC, ACC, and Pac-12, as well as mid-major and smaller conferences. ESPN airs the vast majority of men's basketball conference tournaments during Championship Week in the run-up to the March Madness tournament.

f.  **Golf and Tennis**: With respect to professional golf, ESPN owns exclusive rights to broadcast portions of three of the major events on the PGA Tour. In tennis, ESPN has broadcast rights to three major championships—Wimbledon, the US Open, and the Australian Open.

g.  **College Championships**: ESPN owns the exclusive rights to 40 different NCAA championships across a broad array of sports, including the Women's Basketball NCAA Tournament.

46.     And ESPN's sports rights cover more targeted interests as well, including: UFC Fight Night; 4,000 college baseball games and 3,200 college softball games in the 2024 season alone; annual Pickleball Slam tournaments featuring famed tennis players Andre Agassi, Steffi Graf, and Maria Sharapova; 820 men's and women's college lacrosse games in the 2024 season; the X Games; the World Surf League Championship Tour and U.S. Open of Surfing; and 21 games from the United Football League.

47.     According to a Citi Research report, Disney holds the greatest share of sports broadcasts rights in the United States:

**Figure 2**

| Percentage of Sports Rights in Sports Program Licensing Market | | | | | |
|---|---|---|---|---|---|
| The Walt Disney Company ESPN | FOX | WARNER BROS. DISCOVERY | CBS | NBC | OTHER |
| 26.8% | 17.3% | 9.9% | 12.9% | 13.1% | 17.1% |

48.    Because of Disney's dominant control over sports programming, if a streaming service like Fubo chose not to offer Disney's content, it would lose any consumers who like to watch live sports. Access to ESPN's broadcast content is a must-have for any SLPTV provider in the live sports streaming market, providing leverage that enables Disney to impose supracompetitive licensing costs onto sports streaming services like Fubo.

49.    Consumers do not consider cable packages to be a suitable replacement for streaming services, and thus the Relevant Market is distinct from the market for cable packages. Cable services are generally more expensive than streaming services, offer less flexibility for viewers in terms of viewing location and device, and include bundles of channels including sports and non-sports content.

50.    The Relevant Market satisfies the test for market definition used by federal antitrust agencies known as the SSNIP test. The test asks whether a hypothetical monopolist in a proffered market could impose small but significant (typically 5%) non-transitory price increases without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the relevant market is properly defined.

51.     Here, the SSNIP test is satisfied. As described herein, pursuant to the licensing agreements made between ESPN and sports streaming platforms, ESPN can increase the price of licensing sport league content without driving sports consumers from the market. This is because, without ESPN's content, there is no way for consumers to enjoy the sports content they would otherwise want if ESPN was not part of their respective streaming service.

52.     Defendant Disney has market power in the Relevant Market.

**B.     Anticompetitive Conduct**

53.     The power that Disney has over streaming services who wish to provide its content is extraordinary. This is due in large part to the demand for ESPN's content but also because of ESPN's control over sports programming. ESPN has exclusive access to many entire sporting events or leagues (*i.e.*, an entire playoff tournament) as well as exclusive access over critical pieces of sporting events or leagues (*i.e.*, a specific round of a playoff tournament). This means that, in order to experience the entirety of a given sport, all roads pass through ESPN.

54.     As alleged below, due to this control, Disney is able to force anticompetitive contract clauses in its carriage agreements onto streaming services because, without agreeing to those clauses, those streaming services would lose critical access to content, including sporting leagues or events that consumers desire. Loss of this critical content would result in an immense loss of viewership and subscribers.

1.     Most Favored Nation (MFN) Clauses

55.     According to Fubo, the higher prices it is forced to charge its own subscribers are due in large part to MFN clauses.

56.     Generally, an MFN is a clause in a contract in which one party agrees not to grant more favorable terms to anyone else without offering that same deal to the counter party. MFNs create strong financial incentives for a seller not to offer lower prices because any discount must

be offered to all buyers covered by an MFN. The economics literature has long recognized that MFNs can be used for anticompetitive ends by locking in artificially high floors for a supplier's prices or terms. As the *Wall Street Journal* explained in 2012, large programmers like Disney have "the leverage to write MFNs in such a way that they get better deals" due in part to their "dominance of TV sports."

57.    Consistent with this, Disney has deployed a web of MFNs to coerce Fubo into paying higher prices for its content, including its ESPN content.

58.    In practice, the scheme works as follows:

    a.    *First*, in their carriage agreements with ESPN, Relevant Market competitors (including Disney-owned Hulu) agree to content prices, penetration requirements and economic terms that are financially onerous on smaller distributors like Fubo.

    b.    *Second,* Disney provides relief from above-market prices to Hulu through rebates included in side-deals. Additionally, because Disney is Hulu's majority owner, the premiums that Hulu pays for ESPN content are directly offset by ESPN's receipt of those same premiums. Put differently, money shifts from one Disney pocket (Hulu) to another Disney pocket (ESPN).

59.    Fubo, as an independent streaming service, cannot take advantage of these types of side deals that ESPN provides to Hulu.

    2.    Base Terms

60.    Disney's agreements with streaming services require that such services carry ESPN as part of the base or cheapest bundle of channels it offers. This term restricts the ability of Disney's competitors to offer the cheapest option to consumers sans ESPN. Put differently,

this allows Disney to push up the price of each of Hulu competitor's cheapest bundles by increasing the price of ESPN—which is already far and away the most expensive content for the streaming service to carry.

### 3. Bundling

61.    In order to gain access to ESPN's content, Disney forces competing streaming services to agree to license Disney's non-ESPN content. This pushes up prices, as streaming services (like Fubo) are given no choice but to pay for content that it—and its customers—do not want. Indeed, as the Court found in *fuboTV*, ESPN engages in bundling through their carriage agreements with distributors of sports content, like Fubo, in the Relevant Market. The Court stated, "in exchange for the rights to distribute ESPN to subscribers, Disney might require a distributor to **also carry its entertainment channels, like the Disney Channel or Freeform; and that if the distributor does *not* want to carry those other channels, it does not get to distribute ESPN**."[7]

62.    Disney's carriage agreements also require that their channels have minimum penetration clauses, which means that the bundling is even more lucrative for ESPN (and anticompetitive). Minimum penetration clauses provide that a distributor will ensure a certain product is distributed to consumers; for example, the minimum penetration clause works by ensuring that Disney Channel is on 85% of all Fubo channel packages so that a minimum number of customers are always given (and paying for) Disney Channel. As the Court found in *FuboTV*, "[m]inimum penetration requirements and bundling have allowed programmers to extract significant value from under-performing or lower-performing channels."[8]

---

[7] *fuboTV Inc. v. Walt Disney Co.*, No. 24-CV-01363, 2024 WL 3842116, at *5 (S.D.N.Y. Aug. 16, 2024).

[8] *fuboTV Inc. v. Walt Disney Co.*, No. 24-CV-01363, 2024 WL 3842116, at *6 (S.D.N.Y. Aug. 16, 2024).

63.    With respect to Fubo, Fubo is forced to license and show Disney's non-sports content in order to gain access to ESPN's programming in the Relevant Market. ESPN does this by combining "must have" channels (*i.e.*, ESPN's family of channels) with less-desirable channels (*i.e.*, Disney Channel) so that one cannot be acquired without the other.

64.    This is a classic example of a monopolist leveraging control over one market, here, the Relevant Market, in order to force an unrelated product onto the purchaser. This conduct, known as "block booking," violates the Sherman Act as it results in higher prices for consumers, like Plaintiff and members of the Classes.

65.    This conduct raises prices for consumers because, as Fubo is forced to unnecessarily buy unwanted Disney products to gain access to ESPN, those costs are then passed down to Fubo's consumers in the form of higher prices. And this conduct is extremely lucrative for Disney because it ensures that a less desirable channel is as much as twice as profitable than it otherwise would have been if it were not forced onto unwilling consumers.

### C.    Antitrust Injury

66.    Plaintiff and the Classes are injured by the conduct alleged herein which has caused them to pay higher prices for Fubo's services.

67.    Disney's MFN clauses have two essential terms that allow Disney to anticompetitively cause higher prices in the Relevant Market.

68.    *First*, Disney's MFN agreements with horizontal competitors, such as DirecTV and YouTube TV, require that if a streaming service carries ESPN as part of *any* of its bundles, then that service must necessarily carry ESPN as part of the *base or cheapest* bundle that it offers. This term restricts the ability of Disney's competitors (such as Fubo) to provide an option to consumers to subscribe to a streaming service that omits cable's most expensive channel, ESPN, which Disney owns.

69.     This restores and fortifies the "sports subsidy" long forced on cable and satellite TV subscribers and ensures that, regardless of whether a customer uses a streaming service or cable to view live television, they must pay Disney's monopoly rent for ESPN. Absent the Base Term, Disney would not be able to prevent a horizontal competitor, like Fubo, from providing a "skinny" bundle, which would diminish the number of subscribers paying Disney per month for ESPN and paying for Hulu as a streaming service.

70.     *Second*, in addition to ESPN's Base Term, Disney provides price restrictions in the form of MFN clauses. Disney's carriage agreements with YouTube TV, DirecTV, and Fubo which require Disney to offer the lowest price for ESPN and other channels to those its counterparties if it offers a lower price to any other market participant.

71.     This Price Term ensures that, if Disney provides another service at a lower price, then that price becomes the applicable price for its counterparty. The MFN incentivizes Disney *not* to offer lower prices because any discount must be offered to all counterparties covered by the MFN.

72.     Together, the ESPN Base Term and Price Terms work in tandem to ensure that Disney has direct control over competitor prices, and as explained above and below, Disney can maintain a higher price floor. Specifically, ESPN's Base Term ensures that no streaming participant offers a competitively priced, ESPN-less product, and the MFN Price Term allows Disney to dictate the same higher pricing in lockstep for ESPN across the entire market (because there is no competitive ESPN-less product).

73.     Disney uses Hulu, therefore, to set a price floor through its MFN price terms. Because Disney operates a direct market participant, Hulu + Live TV, as well as ESPN, Disney can control ESPN's prices across the entire market. Although Disney's ESPN must be sold at the

lowest price available to market participants consistent with the MFN, Disney controls one of the two largest providers, providing it a direct input into how prices for ESPN are calculated.

74.    For example, if Disney lowers its price on Hulu + Live TV by 10%, the MFN Price Term will require that other market participants also receive the same price. So, as long as Disney maintains a price floor using Hulu, it can set a price floor for the entirety of the Relevant Market, provided that other horizontal competitors must offer ESPN as part of their base packages.

75.    Horizontal competitors, therefore, must pay the cost of ESPN set by Disney, plus the other costs of their service—Disney, however, provides ESPN through Hulu at its own, far lower cost.

76.    The net effect is that Disney, through ESPN and its carriage agreements, has a direct cost input into its horizontal competitors' offerings—the most expensive cost input, ESPN. If Disney raises prices through Hulu and negotiates carriage agreements setting ESPN prices at the Hulu price, it can set a higher minimum price for streaming services in the Relevant Market with those carriage agreements.

77.    The MFN Price Term is based on the price of ESPN offered to a horizontal competitor, not the cost at which Disney provides ESPN to its own Hulu subsidiary. Thus, ESPN prices are cost increases for competitors, but the price increase to Disney's own competing service, Hulu, is illusory—a mere accounting fiction.

78.    **Harm to Consumers.** ESPN is the largest cost for any SLPTV provider in the Relevant Market. A provider must pass that cost onto its customers as it increases. Thus, by increasing the cost of ESPN, and by forcing ESPN into base bundles across the entire Relevant

Market, Disney is able to impose higher costs on rivals that it itself does not bear through its Hulu + Live TV product.

79.     Here, Fubo has had to increase prices to its consumers as a result of Disney's illicit conduct. As Disney collects a monopoly rent for use of its programming, consumers pay higher prices for streaming platforms like Fubo that they ordinarily would not have paid but for the anticompetitive contract clauses. *First*, Fubo had to increase prices from $54 a month for its basic package in 2019 to $79.99 per month in 2024, in substantial measure as a result of ESPN's price increases. *Second*, the MFNs allow Disney to maintain higher prices charged to Fubo which result in higher prices to the Classes . *Third*, Plaintiff and members of the Classes are harmed because the bundling requirement forces them to pay for content that they otherwise do not want. Fubo is marketed to sports viewers. When Disney requires the bundling of non-ESPN programing, it is also requiring consumers to pay for that superfluous content. *Finally,* the MFNs obliterate Fubo's (and any other similar competitors') ability to disrupt the Relevant Market. This means that, in a normal functioning market, Fubo could charge lower prices in order to capture market share from competitors such as Hulu, DirecTV, and YouTube. Yet, Fubo cannot do so due to Disney's MFNs, which make Disney's content, including ESPN, too expensive to broadcast without raising its prices to a supracompetitive level.

80.     Fubo has more than 1.5 million current subscribers. Based on the foregoing, each Fubo subscriber is paying more per month because of Disney's conduct. Additionally, some consumers pay for more than basic packages and are harmed even more significantly.

81.     Additionally, Disney's Base Term harms competition in the Relevant Market by reducing consumer choice.

82.    Because any rival that wishes to carry ESPN must do so pursuant to the ESPN Base Term, there are no comparable products in the Relevant Market without ESPN in their base bundle. All consumers, therefore, must pay for ESPN. This occurs whether they want it or not. Moreover, customers that left cable and satellite TV in favor of streaming in order to escape mandatory high-cost channels in their TV packages are faced with the same inefficient and unwanted product in the streaming service market—a market which intended to offer the very opposite product.

83.    The anticompetitive effects are clear. Users must buy services that they do not want, pay higher prices that they should not otherwise have to pay and have their choices eliminated because ESPN-less base bundles in the Relevant Market simply do not exist. There are no procompetitive benefits to this, as it forces unwilling consumers to pay for ESPN to subsidize those consumers who do.

84.    **Harm to Competition.** In a market free of Disney's unlawful restraints, streaming services would be able to offer their products in the Relevant Market at lower prices. However, ESPN's carriage agreements allow Disney to distort the market, harming competition, throttling innovation, reducing output, and raising prices.

85.    The artificial MFN-based prices harm competition as described because they prevent smaller, disruptive competitors such as Fubo, from offering lower subscription rates to consumers, thereby raising barriers to entry. These MFN-based prices benefit Hulu and its parent, Disney, by hamstringing Fubo as a competitor and disruptor, preventing Fubo from offering a service that benefits consumers and capturing market share.

86.    For example, an ESPN price increase from $9 to $10 per month in the Relevant Market would require a $1 price increase by Hulu's competitors, including Fubo. These

competitors would then need to bear and pass on the cost to their subscribers. Disney and Hulu, on the other hand, experience no meaningful change to their true cost of providing ESPN. And Disney also profits from ESPN price increases because rivals' costs and, accordingly, prices offered to consumers, increase. This allows Hulu to recapture the consumers lost by its competitors due to the supracompetitive pricing imposed by Disney to license content by ESPN.

87.    Disney's anticompetitive conduct has already forced other disruptors out of the Relevant Market and threatens to do the same to Fubo. Horizontal competitors of Hulu who have been driven from the market include Sony's PlayStation Vue, T-Mobile's TVision, and Duo.

## V.    CLASS ALLEGATIONS

88.    This Action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23. Plaintiff brings this class action on behalf of himself and all other similarly situated individuals. The Nationwide Class Plaintiff seeks to represent is defined as follows:

> **Nationwide Class.** All persons, businesses, entities and corporations in the United States who paid for a FuboTV subscription from the period beginning on January 1, 2021 through the present (the "Class Period").

89.    In the alternative and in addition to the Nationwide Class, Plaintiff seeks to represent the following State Repealer Class:

> **State Repealer Class.** All persons, businesses, entities and corporations in one of the *Illinois Brick* Repealer States (defined below) who paid for a FuboTV subscription during the Class Period.

90.    The "*Illinois Brick* Repealer States," for purposes of this Complaint, include Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin.

91.     Excluded from the Classes are: Defendant and Defendant's subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; Plaintiff's counsel; and all judges assigned to hear any aspect of this litigation; as well as their immediate family members.

92.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

93.     **Numerosity.** Both Classes are so numerous that joinder would be impracticable. There are over a million subscribers to Fubo nationally.

94.     **Commonality.** There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

        a.   Whether Defendant violated the antitrust laws;

        b.   Whether Defendant engaged in anticompetitive conduct;

        c.   Whether Plaintiff was harmed;

        d.   Whether Plaintiff is entitled to declaratory relief and injunctive relief to end Defendant's conduct; and

        e.   Whether Plaintiff and Class members are entitled to damages and other relief.

95.     **Typicality.** Plaintiff's claims are typical of those of other members of the Classes because Plaintiff, like every other member of the Classes, was harmed by way of the anticompetitive conduct alleged herein. Plaintiff, like all other members of the Classes, was injured by Defendant's uniform conduct. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other members of the Classes, such that there are no

defenses unique to Plaintiff. The claims of Plaintiff and those of the other members of the

Classes arise from the same operative facts and are based on the same legal theories.

96.    **Adequacy of Representation**. Plaintiff will fairly and adequately represent and

protect the interests of members of the Classes in that he has no disabling or disqualifying

conflicts of interest that would be antagonistic to those of the other members of the Class. The

damages and infringement of rights Plaintiff suffered are typical of other members of the

Classes, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the

Classes. Plaintiff has retained counsel experienced in antitrust class action litigation, and Plaintiff

intends to prosecute this action vigorously.

97.    **Superiority of Class Action.** A class action is superior to other available methods

for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual

lawsuits would not be economically feasible for individual members of the Classes, and

certification as a class action will preserve judicial resources by allowing the Classes' common

issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and

discovery in individual actions that are based on an identical set of facts. In addition, without a

class action, it is likely that many members of the Classes will remain unaware of the claims they

may possess.

98.    The litigation of the claims brought herein is manageable. Defendant's uniform

conduct, the consistent provisions of the relevant laws and the ascertainable identities of

members of the Classes demonstrate that there would be no significant manageability problems

with prosecuting this lawsuit as a class action.

99.    Adequate notice can be given to members of the Classes directly using

information maintained in the parties' records.

100.    **Predominance.** The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

101.    This proposed class action does not present any unique management difficulties.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of Section 1 of the Sherman Act for Unlawful MFN Agreements**

**(On behalf of Nationwide Class for Damages and Equitable Relief)**

102.    Plaintiff realleges and repeats each and every allegation as if fully set forth herein.

103.    Disney violated 15 U.S.C. § 1 by entering into, furthering, and/or enforcing unreasonable restraints of trade. Disney has entered into a web of horizontal agreements with direct competitors in the Relevant Market, including YouTube, DirecTV, and Fubo. The purpose and effect of doing this is to raise prices and/or set a price floor for streaming in the Relevant Market.

104.    Disney's agreements include anticompetitive terms in carriage agreements, including MFNs that restrict price terms for ESPN and other Disney-controlled programming. Disney's carriage agreements also require that direct competitors in the Relevant Market include ESPN as part of their base or cheapest plan ("ESPN's Base Term"). Disney has entered into some variation of these agreements with numerous participants in the Relevant Market, including Hulu's horizontal competitors, YouTube, DirecTV, and Fubo.

105.    Disney and ESPN's MFN agreements substantially affect interstate commerce.

106.    Disney controls the second largest competitor in the Relevant Market, Hulu. Hulu is considered to be part of the same entity as Disney for purposes of the Sherman Act.

107.    Because ESPN is the largest cost input in the Relevant Market, Disney uses ESPN to maintain minimum prices throughout the Relevant Market, including through the use of MFN clauses in carriage agreements as well as ESPN's Base Term.

108.    Specifically, Disney's ESPN Base Term forces carriage agreement counterparties to carry ESPN as part of a minimum/base bundle provided to customers in the Relevant Market. Disney also forces MFN agreements on carriage counterparties. Taken together, these terms allow Disney to set supracompetitive prices in the Relevant Market.

109.    Moreover, because Disney controls both ESPN and Hulu, it can impose costs on Relevant Market competitors without meaningfully increasing costs for its own product (Hulu).

110.    Disney has market power in the Relevant Market. Additionally, Disney has the largest share of sports broadcast rights in the United States.

111.    The Relevant Market is concentrated and barriers to entry are high. And because Disney controls must-have sports channels it has substantial market power over participants in the Relevant Market such as Fubo, which need access to those channels to offer a commercially viable product.

112.    Defendant's horizontal restraints of trade and antitrust violations are subject to the *per se* rule. Defendant uses ESPN's control over the sports program licensing market in order to attempt to eliminate a horizontal competitor to its sister company, Hulu. ESPN does this by using an unlawful MFN agreement. The way this works is as follows.

113.    Disney's carriage agreements impose significantly more onerous content prices, penetration requirements, and economic terms on smaller distributors like Fubo. Then, in exchange for higher pricing and the other onerous terms required by Disney, Disney agrees to afford Hulu MFN status in the Relevant Market. This means that, as a result of the MFN clauses,

Disney cannot offer Fubo better terms unless it also agrees to offer those same terms to Hulu. In order to make up for the onerous requirements, Hulu is afforded rebates and relief from above-market prices through side deals that are made with its parent, Disney. Hulu's rebate is direct. Because Disney is Hulu's majority owner, the premiums that Hulu pays for ESPN content are directly offset by ESPN's receipt of those same premiums. Put differently, the Disney merely shifts money from one Disney pocket (Hulu) to another (ESPN).

114.    Collectively, these acts taken by Disney corrupt the Relevant Market, causing Fubo's customers to pay higher prices for platforms in the Relevant Market other than Hulu.

115.    Alternatively, Disney's MFN agreements unreasonably restrain trade under the rule of reason.

116.    Disney's MFN agreements have anticompetitive effects. Among other things, the MFN agreements raise prices for Fubo and consumers alike; set an artificially high price floor that prevents price competition; severely disadvantage new and nascent competitors; raise barriers to entry; and facilitate coordination or collusion among horizontal competitors.

117.    Disney cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

118.    As a result of the MFN agreements, consumers have suffered injury and damages that flow from Disney's antitrust violations.

119.    Plaintiff seeks treble damages as well as a declaratory judgment and injunctive relief consistent with this cause of action.

## SECOND CAUSE OF ACTION

**Violation of Section 1 of the Sherman Act for Unlawful Block Booking**

**(On behalf of Nationwide Class for Damages and Equitable Relief)**

120.    Plaintiff realleges and repeats each and every allegation as if fully set forth herein.

121.    In its carriage agreements with Fubo, Disney conditioned the licensing of ESPN on Fubo's agreement to license and broadcast less desirable (and unwanted) content from Disney. Disney requires Fubo to broadcast virtually all of this content to all or substantially all of Fubo's English-language subscribers.

122.    Disney's above-described conduct constitutes unlawful "block booking," which is the practice of licensing one set of programming to a distributor on the condition that the distributor licenses and distributes other programming from the programmer.

123.    Disney has wielded its market power to coerce Fubo into purchasing less desirable content by expressly conditioning Disney's licensing of ESPN on Fubo's agreement to license and broadcast Disney's less wanted non-live-sports content. Absent this conduct, Fubo would not license all of this content which it is forced to license, broadcast, and, ultimately, force Fubo consumers to pay for.

124.    But for Disney's conduct, the price of Fubo, as well as its content, would better favor consumers. However, because of Disney's conduct, consumers of Fubo are harmed in the form of higher prices and paying for content that they do not want.

125.    Plaintiff seeks treble damages as well as a declaratory judgment and injunctive relief consistent with this cause of action.

## THIRD CAUSE OF ACTION

### Violation of State Laws

### (On behalf of the State Repealer Class – For Damages)

126.    Plaintiff realleges and repeats each and every allegation as if fully set forth herein.

127.    Plaintiff asserts claims under the following state laws on behalf of members of State Repealer Class:

Arizona Uniform State Antitrust Act

Ariz. Rev. Stat. § 44-1401, *et seq.*

128.    **Arizona.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

129.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

130.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

Arkansas Deceptive Trade Practices Act,

Ark. Code Ann. § 4-88-101, *et seq.*

131.    **Arkansas.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

132.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

133.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

California Cartwright Act

Cal. Bus. & Prof. Code § 16700, *et seq.*

134.    **California.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

135.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

136.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

Colorado State Antitrust Act

Colo. Rev. Stat. §§ 6-4-101, *et seq.*

137.    **Colorado.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

138.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

139.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

Connecticut Antitrust Act

Connecticut General Statutes §§ 35-24 *et seq.*

140.    **Connecticut.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

141.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

142.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

District of Columbia Antitrust Act

D.C. Code § 28-4501*, et seq.*

143.    **District of Columbia.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

144.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

145.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

Florida Deceptive and Unfair Trade Practices Act

Fla. Stat. § 501.201, *et seq.*

146.    **Florida.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

147.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

148.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

Hawaii Antitrust Act

Haw. Rev. Stat. § 480-4

149.    **Hawaii.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

150.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

151.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

Illinois' Antitrust Act

740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

152.    **Illinois.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

153.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

154.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

Iowa Competition Law

Iowa Code § 553.1, *et seq.*

155.    **Iowa.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

156.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

157.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

Kansas Restraint of Trade Act

Kan. Stat. Ann. § 50-101, *et seq.*

158.    **Kansas.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

159.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

160.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

Maine's Antitrust Statute,

Me. Rev. Stat. Ann. tit. 10 § 1101, *et seq.*

161.    **Maine.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

162.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

163.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

Maryland Antitrust Act

Maryland Code, Com. Law § 11-201, *et seq.*

164.    **Maryland.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

165.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

166.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

Massachusetts Consumer Protection Act

Mass. Gen. Laws ch. 93A § 1, <em>et seq.</em>

167.    **Massachusetts.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

168.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

169.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

Michigan Antitrust Reform Act

Mich. Comp. Laws § 445.771, <em>et seq.</em>

170.    **Michigan.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

171.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

172.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

Minnesota's Antitrust Law

Minn. Stat. § 325D.49, <em>et seq.</em>

173.    **Minnesota.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

174.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

175.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

Mississippi's Antitrust Statute

Miss. Code Ann. § 75-21-1, <em>et seq.</em>

176.    **Mississippi.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

177.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing

consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

178.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

<u>Missouri Merchandising Practices Act,</u>

<u>Mo. Ann. Stat. § 407.010, *et seq.*</u>

179.    **Missouri.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

180.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

181.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

<u>Montana Consumer Protection Act of 1973</u>

<u>Mont. Code, §§ 30-14-101, *et seq.*</u>

182.    **Montana.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

183.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

184.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

The Nebraska Junkin Act

Neb. Rev. Stat. § 59-801, <em>et seq.</em>

185.    **Nebraska.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

186.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

187.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

Nevada Unfair Trade Practices Act

Nev. Rev. Stat. § 598A.010, <em>et seq.</em>

188.    **Nevada.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

189.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

190.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

New Hampshire's Antitrust Statute

N.H. Rev. Stat. Ann. tit. XXXI, § 356:1, *et seq.*

191.    **New Hampshire.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

192.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

193.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

The New Mexico Antitrust Act

N.M. Stat. Ann. §§ 57-1-1, *et seq.*

194.    **New Mexico.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

195.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

196.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

The New York Donnelly Act

N.Y. Gen. Bus. Law §340

197.    **New York.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

198.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

199.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

<u>The North Carolina General Statutes</u>

<u>N.C. Gen. Stat. § 75-1, *et seq.*</u>

200.    **North Carolina.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

201.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

202.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

<u>The North Dakota Uniform State Antitrust Act</u>

<u>N.D. Cent. Code § 51-08.1, *et seq.*</u>

203.    **North Dakota.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

204.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

205.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

Oregon's Antitrust Law

Or. Rev. Stat. § 646.705, <em>et seq.</em>

206.    **Oregon.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

207.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

208.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

The Puerto Rican Antitrust Law

P.R. Laws Ann. tit. 10 §§ 258, <em>et seq.</em>

209.    **Puerto Rico.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

210.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing

consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

211.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

<u>The Rhode Island Antitrust Act</u>

<u>Rhode Island General Laws §§ 6-36-1, *et seq.*</u>

212.    **Rhode Island.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

213.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

214.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

<u>South Carolina Unfair Trade Practices Act</u>

<u>S.C. Code Ann. § 39-5-10 *et seq.*</u>

215.    **South Carolina.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

216.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

217.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

South Dakota's Antitrust Statute

S.D. Codified Laws § 37-1-3.1, <em>et seq.</em>

218.    **South Dakota.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

219.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

220.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

The Tennessee Trade Practices Act

Tenn. Code Ann. § 47-25-101, <em>et seq.</em>

221.    **Tennessee.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

222.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

223.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

The Utah Antitrust Act

<u>Utah Code Ann. §§ 76-10-3101, *et seq.*</u>

224.    **Utah.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

225.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

226.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

<u>Vermont Consumer Fraud Act,</u>

<u>Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*</u>

227.    **Vermont.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

228.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

229.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

<u>Virginia Consumer Protection Act,</u>

<u>Va. Code Ann. § 59.1-196, *et seq.*</u>

230.    **Virginia.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

231.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

232.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

West Virginia's Antitrust Statute

W. Va. Code § 47-18-1, <em>et seq.</em>

233.    **West Virginia.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

234.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

235.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

Wisconsin's Antitrust Act

Wis. Stat. Ann. § 133.01(1), <em>et seq.</em>

236.    **Wisconsin.** Defendant has restrained trade and have entered into unlawful agreements in violation of state law.

237.    Defendant's conduct has had the following effects: (1) manipulating prices in the Relevant Market, (2) distorting competition in the Relevant Market, and (3) intentionally causing

consumers to pay supracompetitive prices for Fubo's streaming service. During the relevant time period, Defendant's illegal conduct substantially impacted state commerce.

238.    Accordingly, Plaintiff and Class members seek all forms of available relief under this statute, including actual damages, treble damages, and reasonable costs and attorneys' fees.

239.    Each of these state statutes are substantially similar, seek the same kind of relief, and intend to protect against the same harms that other antitrust statutes (federal and state) were codified to redress.

### FOURTH CAUSE OF ACTION

### Unjust Enrichment

### (On behalf of the State Repealer Class)

240.    Plaintiff realleges and repeats each and every allegation as if fully set forth herein.

241.    Plaintiff and Class members paid higher prices for Defendant's content than what would have otherwise occurred in a market free of Defendant's unlawful conduct.

242.    Plaintiff and Class members conferred a benefit upon Defendant with their money. Specifically, they paid for streaming platforms other than Hulu (such as Fubo) in order to gain access to Disney's content. In doing so, they paid supracompetitive prices to gain access to Disney's content through their chosen streaming platform, Fubo.

243.    Defendant knew that Plaintiff and Class members conferred a benefit which Defendant accepted. Defendant profited heavily from these transactions.

244.    Defendant enriched itself, however, by charging higher prices in the market for its content and then giving its subsidiary (Hulu) favorable deals that enriched Defendant. Instead of providing the same prices for the exact same product to all distributors, Disney favored its subsidiary company in order to drive Fubo, an innovative, low-priced sports streaming service in

the Relevant Market, from existence. Defendant calculated how it could capture Fubo's market share and harmed consumers through supracompetitive pricing in a way that would allow them to recapture those same consumers.

245.    Under principles of equity and good conscience, Defendant should not be permitted to retain the money made through these unconscionable acts.

246.    Plaintiff and Class members have no adequate remedy at law.

247.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered injury (and will continue to suffer injury), including in the form of higher prices in the Relevant Market.

248.    Defendant should be compelled to disgorge profits from this unlawful scheme into a common fund or constructive trust, for the benefit of Plaintiff and Class members. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class members overpaid for Defendant's services and goods.

## VII.  DEMAND FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Classes, respectfully ask this Court for a judgment that:

A.    Certifies the Classes pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) and directs that reasonable notice of this Action, as provided by Federal Rule of Civil Procedure 23(c)(2) be given to the Class, and appoints Plaintiff as representative of the Class;

B.    Appoints Plaintiff's counsel as class counsel;

C.    Enters judgment against Defendant, and in favor of Plaintiff and the Classes, holding Defendant liable for the antitrust violations as alleged herein;

D.    Awards a declaratory judgment, declaring that Disney's MFN/Price Term, Base Term and Bundling agreements were each, both individually and collectively, done for illegal,

anticompetitive purposes, was an unreasonable restraint of trade, and had anticompetitive effects on the Relevant Market in violation of the antitrust laws;

E. Grants permanent injunctive relief enjoining Disney from making agreements with its downstream distributors in respect of its content in the Relevant Market;

F. Awards Plaintiff and the Classes actual, treble, and exemplary damages as permitted plus interest in accordance with the law;

G. Awards such equitable relief as is necessary to correct for the anticompetitive market effects as caused by Defendant's unlawful conduct, including disgorgement, restitution, and the creative of a constructive trust;

H. Awards Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees; and

I. Directs such further relief as it may deem just and proper.

## I.    JURY TRIAL DEMAND

249. Plaintiff and members of the Classes demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

DATED: January 14, 2025                    Respectfully submitted,

                                           */s/ Gregory S. Asciolla*
                                           Gregory S. Asciolla
                                           Alexander E. Barnett
                                           Jonathan S. Crevier
                                           John M. Shaw
                                           **DICELLO LEVITT LLP**
                                           485 Lexington Avenue, Suite 1001
                                           New York, New York 10017
                                           (646) 933-1000
                                           gasciolla@dicellolevitt.com
                                           abarnett@dicellolevitt.com
                                           jcrevier@dicellolevitt.com
                                           jshaw@dicellolevitt.com

Joseph J. DePalma (*pro hac* forthcoming)
**LITE DEPALMA GREENBERG
& AFANADOR, LLC**
570 Broad Street, Suite 1201
Newark, NJ 07102
(973) 623-3000
jdepalma@litedepalma.com

Mindee J. Reuben (*pro hac* forthcoming)
Steven J. Greenfogel (*pro hac* forthcoming)
**LITE DEPALMA GREENBERG
& AFANADOR, LLC**
1515 Market Street, Suite 1200
Philadelphia, PA 19102
(267) 314-7980
mreuben@litedepalma.com
sgreenfogel@litedepalma.com

*Counsel for Plaintiff and members of the Classes*